UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| TERRENCE K. NEWTON, SR. | CIVIL ACTION |
| VERSUS | 21-373-SDD-RLB |
| ILLINOIS CENTRAL RAILROAD COMPANY | |

**RULING**

This matter is before the Court on the *Motion for Summary Judgment*[1] by IC, Illinois Central Railroad Company ("IC" or "Defendant"). Plaintiff, Terrence K. Newton, Sr. ("Newton" or "Plaintiff"), has filed an *Opposition*[2] to this motion, to which IC filed a *Reply*.[3] For the following reasons, the Court finds that IC's motion should be granted.

**I.    FACTUAL BACKGROUND**

**A.  Local Rules – Statements of Fact**

Local Rule 56(f) provides:

Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted. **An assertion of fact set forth in a statement of material facts shall be followed by a citation to the specific page or paragraph of identified record material supporting the assertion**. The court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment. **The court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts**. (emphasis added).

---

[1] Rec. Doc. 39.
[2] Rec. Doc. 42.
[3] Rec. Doc. 45.

Local Rule 56 (c) requires an opposing party to:

> submit with its opposition a separate, short, and concise statement of material facts. **The opposing statement shall admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts and unless a fact is admitted, shall support each denial or qualification by a record citation as required by this rule**. Each such statement shall begin with the designation "Admitted," "Denied," or "Qualified" and, in the case of an admission, shall end with such designation. The opposing statement may contain in a separately titled section additional facts, each set forth in a separately numbered paragraph and supported by a record citation as required by subsection (f) of this rule. (emphasis added).

IC complied with the Local Rules and submitted a Statement of Material Facts with citations to record evidence. Newton submitted with his Opposition a Statement of Uncontested Material Facts;[4] however, this document in no way complies with Local Rules 56(c) or (f). Newton provides no citations to support any statements he offers, and he fails to admit, deny, or qualify any statements offered by IC. Accordingly, the following statements of fact are deemed admitted by Newton for purposes of this Ruling.[5]

### B. IC's Business Policies and Newton's Roles

IC is a rail carrier that does business in the Middle District of Louisiana.[6] Newton began his employment with IC in 2006 in the role of laborer.[7] Newton held several different positions with IC until he became a Foreman in 2013.[8] As Foreman, Newton was in charge of a crew that handled problems on the track.[9] All foremen who work for IC are responsible for the maintenance of all track components, and they must

---

[4] Rec. Doc. 42-1.
[5] The Court considered the scant citations to record evidence in the body of Newton's Opposition; however, none of Newton's cited evidence controverted IC's documented statements of fact.
[6] Rec. Doc. 41, p. 224, Declaration of Thomas Sullivan ("Sullivan Decl.") ¶ 2.
[7] Rec. Doc. 39-5, Newton Dep. pp. 10-11.
[8] *Id.* at p. 11.
[9] *Id.* at pp. 43, 51; Newton Dep. Ex. 11.

understand and comply with all track safety standards, Operating Rules, and safe work procedures.[10]  During the course of his employment Newton received routine adequate reviews although he was instructed to take his time and focus on the job.[11]

In his deposition, Newton described the responsibilities of an IC foreman.  A foreman and his crew only have authority to work within a designated area of a train track.[12] As the foreman, it was Newton's responsibility to obtain a track authority to establish the work area of his crew.[13]  A "track authority" is a directive that is issued either over a radio or a computer that authorizes the employee to occupy a segment of track.[14] Newton was required to work with IC's Rail Traffic Control ("RTC") team in Illinois to set up and release authority to occupy the track.[15] Establishing a crew's track authority allows everyone else on the track to know where a specific crew is working and provides protection for the employees while they are working.[16]  Failure to establish proper track authority could result in an oncoming train coming into the area and hitting an employee working on that track.[17]  Thus, track authority violations are considered serious safety violations due to the potential risk of physical injury and death to employees.[18]

To ensure the safety of its employees, IC provides employees with safety and rules training which require employees to participate in safety meetings, pass operating exams,

---

[10] *Id.* at pp. 53-54.
[11] *Id.* at pp. 106-107, Newton Dep. Ex. 32.
[12] *Id.* at pp. 42-43.
[13] *Id.*
[14] *Id.* at pp. 43-44; Rec. Doc. 41, pp. 226-227, Sullivan Decl. ¶ 8.
[15] Newton Dep. pp. 43-44.
[16] *Id.*; Rec. Doc. 41, pp. 226-227, Sullivan Decl. ¶ 8.
[17] *Id.*
[18] Sullivan Decl. ¶ 8; Rec. Doc. 41, p. 292, Declaration of Duane L. Spears ("Spears Decl.") ¶ 6.

and keep their own copies of safety handbooks, including applicable railroad operating rules ("United States Operating Rules" or "USOR").[19]

Newton received two full days of classroom training on the USOR when he was hired and again on a quarterly basis for refresher training.[20] He was required to be familiar with all operating rules, and he testified that he read the rules and kept a copy of his rule book with him for reference at all times during his workday.[21] Newton was tested on compliance with and knowledge of USOR rules and successfully passed these tests.[22] He also received training and was familiar with the On-Track Safety Rules.[23] Newton testified that he considered safety to be the "number one" priority at IC, and he understood that dangerous consequences could result if workers did not follow safety rules.[24]

As a union member, Newton was subject to a collective bargaining agreement ("CBA") governing the terms and conditions of his employment, including discipline.[25] Pursuant to the CBA, IC must conduct a formal investigation before it assesses discipline, unless the employee agrees to accept responsibility for the incident and waives the investigation. Investigative hearings are fact-finding hearings designed to determine whether an employee is at fault for violating company rules, policies, laws, or practices. Occasionally, an employee may decide to waive an investigative hearing, admit to the conduct, and receive discipline; however, this wavier is unavailable if the discipline results in termination.[26]

---

[19] Newton Dep. p. 45; Newton Dep. Ex. 8 ("United States Operating Rules" or "USOR"); Spears Decl. ¶ 3.
[20] Rec. Doc. 39-5, Newton Dep. pp. 45-46, 49.
[21] *Id.* at pp. 46, 48.
[22] *Id.* at pp. 48-49.
[23] *Id.* at pp. 49-50; Newton Dep. Ex. 9.
[24] *Id.* at p. 12.
[25] *Id.* at pp. 50-51; Newton Dep. Ex. 10; Sullivan Decl. ¶¶ 6-7.
[26] *Id.*; Sullivan Decl. ¶¶ 6-7.

In 2017, IC implemented a Discipline Policy intended to promote uniformity of decisions in similar situations, avoid favoritism, and increase predictability in disciplinary outcomes.[27] Newton was aware of the policy.[28] The Discipline Policy promotes "the safe, orderly, and efficient operation of the railroad" by providing "direction for the administration of discipline in a consistent and fair manner, with a focus on deterring and preventing future Violations."[29] The Discipline Policy established a progressive discipline system that ensured consistent application of discipline for similar rules violations.[30] The Discipline Policy classifies rule violations from Level 1 to Level 4, with Level 1 being the least egregious, up to Level 4, which are violations that result in immediate dismissal.[31]

The Policy explains the levels as follows: A Level 1 violation is "non-critical," such as a peer-to-peer rule violation and failure to wear personal protective equipment; a Level 2 violation is "serious and/or has the potential to result in an accident or incident, damage equipment or cause injury," such as late reporting of an accident or injury and failure to properly secure cars or locomotives; a Level 3 violation is a violation of a "critical rule" or a violation "that is related to or implicates a critical rule," including "conduct that may subject the employee to mandatory decertification as required by FRA regulations;" and a Level 4 violation "involves conduct that is extremely serious enough to result in immediate termination," such as purposeful disregard for rules or policies and failure or refusal of a drug or alcohol test.[32] The Policy also describes how cumulative violations

---

[27] Newton Dep. at p. 38; Newton Dep. Ex. 5; Sullivan Decl. ¶ 4, Sullivan Decl. Ex. A; Spears Decl. ¶ 4, Spears Decl. Ex. A.
[28] Newton Dep. at p. 38.
[29] *Id.*, Newton Dep. Ex 5 at p. 1.
[30] Sullivan Decl. ¶ 4.
[31] Newton Dep. at pp. 38-40, Newton Dep. Ex. 5 at pp. 6-8.
[32] Newton Dep. Ex. 5 at pp. 6-8.

may result in progressive discipline and provides detailed matrices.[33] The "look-back" period regarding disciplinary records is three years, beginning with the Discipline Policy's effective date of October 23, 2017.[34] This policy was in effect at the time of Newton's track authority violations.[35]

The Discipline Policy provides for a Discipline Review Panel ("DRP") to review disciplinary decisions in certain circumstances, including when termination is recommended.[36] The DRP has final authority on any termination decision involving a union employee resulting from the disciplinary process.[37]

**C. Newton's July 10, 2018 Track Authority Violation**

On July 10, 2018, Newton was working as Track Foreman in Baton Rouge, Louisiana with his crew on an area of track.[38] Because another crew was already working on the same segment of track, Newton and his crew were required to contact that crew before occupying the track.[39] Although Nelson had not sought or received track authority to set on the track, nor had he contacted the foreman with whom he was supposed to share track authority, Newton informed his crew that "they were good" to set their truck onto the rail.[40] While Newton's crew was performing work, they observed the other crew coming towards them on the track.[41] The oncoming crew's supervisor immediately told Newton's crew that they were in violation of the applicable operating rules.[42] Michael

---

[33] *Id.*
[34] Sullivan Decl. ¶ 4.
[35] Newton Dep. at pp. 38-39.
[36] *Id.* at p. 38, Newton Dep. Ex. 5 at pp. 4-5; Sullivan Decl. ¶ 7.
[37] *Id.*; Sullivan Decl. ¶ 7.
[38] *Id.* at pp. 55-58.
[39] *Id.* at pp. 56-57, Newton Dep. Ex. 14.
[40] *Id.* at pp. 54-61, 63, Newton Dep. Ex. 13; Rec. Doc. 41, p. 361, Declaration of Chase Gregr ("Gregr Decl.") ¶ 7, Gregr Decl. Ex. A.
[41] Newton Dep. at pp. 58-61.
[42] *Id.*

Jones, a trackman on Newton's crew, thanked the supervisor for the warning, observing that the other car coming down the track "could have been bad."[43] Fortunately, Newton and his crew were able to get off the track prior to any accident occurring.[44]

Newton's supervisor, Track Supervisor Chase Gregr ("Gregr"), came out to the site, interviewed the crew, and gathered statements from all involved.[45] Newton signed a written statement the same day, admitting that he had failed to contact the other crew's foreman as he was expected to do, stating, "It slip my mind[.] Just that fast[.] It was on me! I m[e]ss up!"[46]

On July 20, 2018, Newton was issued a Notice of Investigation to attend an investigatory hearing related to the July 10, 2018 track authority incident.[47] Pursuant to his CBA, Newton received an offer to waive the investigation and accept discipline for the incident.[48] Newton agreed and signed a Waiver of Investigation on July 20, 2018, accepting responsibility for the charged conduct and agreeing that he committed a Level 3 rules violation under IC's Discipline Policy of rules USOR 1004 (Joint Mandatory Directives), OTS 100 (Fouling the Track), and USOR W (Job Briefing / Peer to Peer Communications).[49] Under IC's Discipline Policy, first-time track authority violations are always assessed as a Level 3 Violation and assessed a 30-day suspension due to the possibility of physical injury and death to Company employees.[50] Thus, Newton received

---

[43] Gregr Decl. ¶ 7, Gregr Decl. Ex. A at IC000536.
[44] Newton Dep. at pp. 58-61.
[45] Gregr Decl. ¶ 7.
[46] Newton Dep. at pp. 55, 63-64, Newton Dep. Ex. 13.
[47] *Id.* at p. 54, Newton Dep. Ex. 12.
[48] *Id.* at p. 66, Newton Dep. Ex. 15.
[49] *Id.* at pp. 38, 66-67, Newton Dep. Ex. 5 at pp. 7-8, Newton Dep. Ex. 15.
[50] *Id.* at p. 38, Newton Dep. Ex. 5 at 9-10.

a 30-day suspension from service.[51] Newton completed his suspension and returned to work on August 23, 2018.[52]

### D. Newton's May 6, 2019 Track Authority Violation

Less than 9 months after returning to work, on May 6, 2019, Newton was working as the Foreman of a crew working on a grinding train known as a Loram Rail Grinder.[53] Newton was piloting the train and in charge of the crew, and as the Foreman, Newton was responsible for obtaining track authority for the protection of him and his crew.[54] On this date, Newton had track authority to work in the area between Flannery and West Livingston, which is on the main line of the track.[55] Newton subsequently obtained authority to work between East Livingston and West Livingston, which included a siding of the track.[56]

While working, Newton's crew was asked to clear the way for a train to pass through their designated work area.[57] In response, Newton moved his train into the siding and released all of his track authorities, including the track authority for the siding that he and his crew were currently occupying.[58] This complete release of all track authority rendered his crew effectively invisible on the radar to other crews or trains.[59] The proper procedure in this circumstance was for Newton to release his track authority for the main line while maintaining track authority for the siding, thus allowing the train to pass on the

---

[51] *Id.* at p. 66, Newton Dep. Ex. 15.
[52] *Id.* at pp. 66-67, 92, Newton Dep. Ex. 24.
[53] *Id.* at p. 74.
[54] *Id.*
[55] *Id.*, Newton Dep. Ex. 18.
[56] *Id.* at pp. 74-76, Newton Dep. Ex. 19. Siding is a controlled area of track that is connected on each end to the main track and is used for passing trains.
[57] *Id.* at pp. 75-77, Newton Dep. Ex. 21 at p. 22.
[58] *Id.*
[59] *Id.* at pp. 75-80.

main line while ensuring that he and his crew maintained sole authority to occupy the siding, thus protecting him and his crew.[60]

IC's RTC saw that Newton had released all track authority, called Newton to inquire if he was on the track, and Newton acknowledged that he was.[61] RTC advised Newton that he was unprotected and had no authority protecting himself and his crew.[62] Newton acknowledged the error, and RTC gave Newton a new track authority to work between West Livingston and East Livingston and reported the incident to management.[63]

Newton acknowledged his error: "I had authority in the siding when I got it in there. I was supposed to get another authority to stay in the siding;"[64] and he testified that his conduct on May 6, 2019 constituted a violation: "yes, it's a track authority violation."[65]

Gregr gathered witness statements from Newton and his crew regarding the May 6, 2019 incident.[66] Newton's written statement from the day of the incident states that he "forgot to get [track authority] for siding before clear other authority."[67] Newton subsequently received a Notice of Investigation for the May 6, 2019, incident,[68] and he was informed and aware that he could have union representation at the investigative hearing and that he could call witnesses on his behalf.[69]

On May 10, 2019, IC conducted an investigative hearing regarding the incident.[70] During this hearing, Gregr recounted the May 6, 2019 incident as described above and

---

[60] *Id.* at pp. 75-77.
[61] *Id.* at pp. 75 -78.)
[62] *Id.* at pp. 76-78.)
[63] *Id.* at pp. 76, 79-80, Newton Dep. Ex. 20.
[64] *Id.* at p. 77.
[65] *Id.* at p. 81.
[66] Gregr Decl. ¶ 8, Gregr Decl. Ex. B.
[67] *Id.*; Newton Dep. at p. 72, Newton Dep. Ex. 17.
[68] Newton Dep. at p. 71, Newton Dep. Ex 16.
[69] *Id.* at pp. 71-72.
[70] *Id.* at p. 83, Newton Dep. Ex. 21.

explained Newton's errors.[71] Gregr testified that Newton took responsibility for his conduct and expressed his confusion about his authority.[72] Newton stated: "I'm truly sorry about what happened, and I made a mistake. I got confused on that issue, clearing of the authorities and stuff, and I wish that the company would give me a chance, if not more than if they demote me down back to a trackman there to just keep my job."[73] Newton acknowledged in his deposition that: "And my mistake was I should have got another authority before I hit that button to clear the second – I mean the first authority that I had. That was my mistake, an honest mistake. And I'll take that one because I did do that not intentionally but it happened."[74] Newton also agreed that he should have been disciplined for this violation.[75]

After the hearing, Newton was found to have violated several critical rules,[76] and it was determined that these violations constituted a major safety infraction.[77] Under the Discipline Policy described above, these track authority violations are Level 3 violations.[78] Newton had already received the 30-day suspension for the July 2018 track authority violation, and the Policy provides that, if an employee has a second Level 3 violation within a three-year period, the appropriate and only discipline available is discharge.[79]

---

[71] *Id.* at pp. 81, 83-84, 87; Newton Dep. Ex. 21 at pp. 11-13; Newton Dep. Ex. 22.
[72] *Id.* at p. 83, Newton Dep. Ex. 21 at 11-13.
[73] *Id.*, Newton Dep. Ex. 21 at pp. 22-23.
[74] *Id.* at p. 34.
[75] *Id.* at p. 90.
[76] On-Track Safety Rule 100, Fouling the Track (Newton Dep. at pp. 84-86; Newton Dep. Ex. 21 at pp. 13-14); OTS 101, Authority or Protection (Newton Dep. at p. 83; Newton Dep. Ex. 21 at 14); On-Track Safety Rule 400 (Newton Dep. at p. 83; Newton Dep. Ex. 21 at p. 15); USOR 1003, Track Authority in CTC Territory (Newton Dep. at p. 83; Newton Dep. Ex. 21 at pp. 15-16); USOR General Rule W (Newton Dep. at p. 83; Newton Dep. Ex. 21 at pp. 16-17; Newton Dep. Ex. 22.).
[77] Sullivan Decl. ¶¶ 8-11; Spears Decl ¶¶ 5-6.
[78] Newton Dep. at p. 38, Newton Dep. Ex. 5 at 7-10; Sullivan Decl. ¶¶ 8-11.
[79] *Id.*, Newton Dep. Ex. 5 at 7-10; Sullivan Decl. ¶¶ 8-11.

Accordingly, the Discipline Policy mandated Newton's termination for committing two Level 3 violations within a twelve-month-period.

The DRP, which included Senior Human Resources Manager Duane Spears ("Spears") (a Black male) and Director of Human Resources and Labor Relations Thomas Sullivan ("Sullivan") (a White male), reviewed the transcript, hearing evidence, and presumptive termination recommendation under the Discipline Policy.[80] In accordance with the Discipline Policy, Newton was terminated on May 30, 2019.[81] Both Sullivan and Spears gave sworn statements that Newton's race played no role in their decision to follow the recommendation for termination.[82]

Newton failed to offer any evidence to contradict or dispute the facts set forth above, and he does not dispute any of the above facts in his opposition brief. Indeed, Newton testified that he never heard any racist comments or statements that he believed reflected a discriminatory animus during his employment,[83] and he never reported any concerns of discrimination during his employment with IC until he filed his EEOC Charge.[84]

**E. Newton's Lawsuit**

On February 10, 2020, Newton filed a charge with Louisiana Commission on Human Rights ("LCHR") and the Equal Employment Opportunity Commission ("EEOC") alleging race and age discrimination.[85] However, in this lawsuit, Newton alleges only discrimination based on race, not age. Newton's initial Complaint asserted claims of race

---

[80] Sullivan Decl. ¶ 10; Spears Declaration ¶¶ 2, 5, 6.
[81] Newton Dep. at p. 91, Newton Dep. Ex. 23; Sullivan Decl. ¶ 10; Spears Dec. ¶¶ 5-6.
[82] Sullivan Decl. ¶ 11; Spears Decl. ¶ 6.
[83] Newton Dep. at p. 36.
[84] *Id.* at p. 70.
[85] *Id.* at pp. 12-13, Newton Dep. Ex. 1.

discrimination and retaliation under Title VII of the Civil Rights Act of 1964[86] and corresponding state law. Newton conceded that dismissal of his state law and federal retaliation claims was proper, and the Court dismissed these claims.[87] Upon IC's motion, the Court dismissed Newton's Title VII race discrimination disparate treatment claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure without prejudice, affording Newton an opportunity to amend his Complaint to adequately plead his disparate treatment claim,[88] and Newton filed a Third Amended and Supplemental Complaint.[89]

IC now moves for summary judgment on Newton's Title VII disparate treatment claim, arguing that he has failed to present a *prima facie* case because he has failed to demonstrate that he was qualified for the job held, and he failed to identify a similarly situated comparator outside the protected class who was treated more favorably. Further, IC contends it has presented a legitimate, non-discriminatory reason for Newton's termination, and Newton has presented no evidence that this reason was a pretext for race discrimination. Newton's counters that he has established a *prima facie* case because a purportedly similarly situated White employee, Myles Moman ("Moman"), also an IC Foreman, committed the same infractions as Newton but received lesser or no discipline.[90]

---

[86] 42 U.S.C. § 2000e *et seq*.
[87] *See* Rec. Doc. 46, p. 2 (citing Rec. Doc. 36).
[88] *Id.*
[89] Rec. Doc. 47.
[90] Rec. Doc. 42. In prior versions of Newton's Complaint, he named additional purported comparators; however, in the operative Complaint, and in his Opposition, Newton presents only Moman as a comparator.

## II. LAW AND ANALYSIS

### A. Summary Judgment

In reviewing a party's motion for summary judgment, the Court will grant the motion if (1) there is no genuine issue of material fact, and (2) the mover is entitled to judgment as a matter of law.[91] This determination is made "in the light most favorable to the opposing party."[92] A party moving for summary judgment "'must "demonstrate the absence of a genuine issue of material fact," but need not negate the elements of the nonmovant's case.'"[93] If the moving party satisfies its burden, "the non-moving party must show that summary judgment is inappropriate by setting 'forth specific facts showing the existence of a genuine issue concerning every essential component of its case.'"[94] However, the non-moving party's burden "'is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'"[95]

Notably, "[a] genuine issue of material fact exists, 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[96] All reasonable factual inferences are drawn in favor of the nonmoving party.[97] However, "[t]he Court has no duty to search the record for material fact issues. Rather, the party opposing the summary

---

[91] FED. R. CIV. P. 56(a).
[92] *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); 6 V. MOORE, FEDERAL PRACTICE 56.15(3) (2d ed. 1966)).
[93] *Guerin v. Pointe Coupee Parish Nursing Home*, 246 F.Supp.2d 488, 494 (M.D. La. 2003) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).
[94] *Rivera v. Houston Indep. Sch. Dist.*, 349 F.3d 244, 247 (5th Cir. 2003) (quoting *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998)).
[95] *Willis v. Roche Biomedical Lab., Inc.*, 61 F.3d 313, 315 (5th Cir. 1995) (quoting *Little*, 37 F.3d at 1075).
[96] *Pylant v. Hartford Life and Accident Insurance Company*, 497 F.3d 536, 538 (5th Cir. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).
[97] *Galindo v. Precision American Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985).

judgment is required to identify specific evidence in the record and to articulate precisely how this evidence supports his claim."[98] "Conclusory allegations unsupported by specific facts . . . will not prevent the award of summary judgment; 'the plaintiffs [can]not rest on his allegations . . . to get to a jury without any "significant probative evidence tending to support the complaint."'"[99]

### B. Title VII Race Discrimination – Termination

To prove race discrimination under Title VII, a plaintiff must establish that he is (1) "a member of a protected class" (2) "was qualified for the position" (3) "was subjected to an adverse employment action"; and (4) "other similarly situated persons were treated more favorably."[100] If a plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse actions taken.[101] If the defendant satisfies this burden of production, the burden shifts back to the plaintiff, who must "offer sufficient evidence to create a genuine issue of material fact 'either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic (mixed-motive[s] alternative).'"[102] Prongs one and three are clearly satisfied here, and the Court will assume *arguendo* that Newton was qualified for the position he held. However, the Court finds that Newton has failed to satisfy prong four.

---

[98] *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010).
[99] *Nat'l Ass'n of Gov't Emps. v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 713 (5th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249).
[100] *Septimus v. Univ. of Hous.*, 399 F.3d 601, 609 (5th Cir. 2005).
[101] *Lee v. Kansas City Southern Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009)
[102] *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004); *see also Vaughn v. Woodforest Bank*, 665 F.3d 632, 637 (5th Cir. 2011) (citing same in the context of a Title VII race discrimination case).

1. <u>Similarly Situated Comparators</u>

The law is clear that, "[i]n the context of a race discrimination claim, where the plaintiff alleges that employees who were not members of the protected class received more [favorable treatment], the plaintiff must come forward with **specific evidence** of comparators who were similarly situated."[103]  Courts within the Fifth Circuit define "similarly situated" narrowly.[104]  In evaluating whether an alleged comparator is similarly situated,

> "The employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor [,] or had their employment status determined by the same person[.]"[105] "Employees with different supervisors, who work for different divisions of a company ... generally will not be deemed similarly situated." The Fifth Circuit has further explained, that "employees who have different work responsibilities ... are not similarly situated."[106]

IC concedes that Moman is White, that he also held the job title of Foreman, and that Moman and Newton shared the same supervisor.[107]  However, IC contends Moman is not a proper comparator for Newton because Moman did not commit similar infractions under nearly identical circumstances.

In 2019, while Moman was driving a contractor's truck not owned or insured by IC, he accidentally backed up into his coworker Ronald Keasley's personal vehicle.[108] Gregr

---

[103] *Corley v. Louisiana ex rel. Div. of Admin., Office of Risk Mgmt*, 816 F.Supp.2d 297, 316 (M.D. La. 2011)(citing *Lee v. Kansas City Southern Ry. Co.*, 574 F.3d 253, 259–60 (5th Cir. 2009))(emphasis added).
[104] *See Horton v. G4S Secure Solutions (USA), Inc.*, No. 16-544-SDD-EWD, 2018 WL 1997535 at *5 (M.D. La Apr. 27, 2018)(citing
*Brown v. Bd. of Trustees Sealy Indep. Sch. Dist.*, 871 F.Supp.2d 581, 593 (S.D. Tex. 2012); *see also Lopez v. Kempthorne,* 684 F. Supp. 2d 827, 856-57 (S.D. Tex. 2010)).
[105] *Id.* (quoting *Turner v. Kansas City S. Ry. Co.*, 675 F.3d 887, 893 (5th Cir. 2012)(quoting *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009))).
[106] *Id.* (quoting *Lee*, 574 F.3d at 259 (citing *Wyvill v. United Cos. Life Ins.*, 212 F.3d 296, 302 (5th Cir. 2000)).
[107] Rec. Doc. 45-1, p. 2.
[108] Newton Dep. at pp. 26, 29; Gregr Decl. ¶ 9.

was made aware of the incident,[109] and it was treated as a routine car accident.[110] The incident caused minor property damage to the vehicles, and Keasley, the coworker whose vehicle was hit, could still drive his vehicle.[111]  IC maintains this was not a workplace violation subject to the Discipline Policy.[112] Newton admitted that he was not present for the incident and only knows about it based on what he has heard from other nonsupervisory employees.[113]

In his Opposition, Newton does not offer any evidence to dispute IC's characterization of Moman's incident. Rather, Newton offers his own subjective belief that Moman's "infraction" was "more egregious to Defendant" than his own.[114]  Newton also argues that IC is incorrect in stating that Moman did not commit a rules violation under the Discipline Policy.  Newton contends Moman's conduct should have been assessed as a Level 2 or a Level 4 violation. A Level 2 violation is "serious and/or has the potential to result in an accident or incident, damage equipment or cause injury," and a Level 4 violation "involves conduct that is extremely serious enough to result in immediate termination," such as "making material false statements or concealing material facts concerning matters under investigation." Newton testified in his deposition that, following Moman's collision, Moman called his superiors, and they advised Moman to "tell the insurance company he ran into some type of pole."[115]

The Court finds that Newton has not satisfied the similarly situated comparator prong.  First, the infractions committed by Newton and Moman did not occur under "nearly

---

[109] Gregr Decl. ¶ 9.
[110] Newton Dep. at p. 26; Gregr Decl. ¶ 9.
[111] *Id.* at p. 29; Gregr Decl. ¶ 9.
[112] Gregr Decl. ¶ 9; Spears Decl. ¶ 8, Spears Decl. Ex. C.
[113] Newton Dep. at p. 27.
[114] Rec. Doc. 42, p. 2.
[115] Newton Dep. at p. 140.

identical circumstances." Newton acknowledges that the two "did not commit the exact same offense,"[116] and Newton testified that Moman's incident did not involve a track authority violation.[117] The Court is unpersuaded that a rear-end collision, albeit occurring at work but not on the track, is "nearly identical" to exposing an entire work crew to a potential train collision. Second, even if Moman's accident *was* a comparable infraction, there is no summary judgment evidence before the Court that Moman had committed a similar infraction within the twelve months prior to the rear-end collision. This also distinguishes Moman's discipline posture from Newton's. Third, Newton offers hearsay and rank speculation to support his suggestion that IC intended to "cover up" Moman's accident for insurance purposes, and Newton posits that this conduct should have resulted in Moman being assessed a Level 4 violation by IC. It is not the role of this Court to question the business judgment of IC in its assessment of infraction levels absent some discriminatory animus. Even if there was competent summary judgment evidence to support this purported insurance cover up, there is no evidence indicating that Moman's race played a factor in the decision.

Accordingly, because Newton has failed to point to a proper, similarly situated comparator, he has failed to establish a *prima facie* case of race discrimination. Although the Court need not go further, assuming *arguendo* that Newton could establish a *prima facie* case of race discrimination, he has failed to overcome IC's legitimate, nondiscriminatory reason for his termination with pretext or mixed motive evidence suggestive of race discrimination.

---

[116] Rec. Doc. 42, p. 6.
[117] Newton Dep. at p. 42.

### 2. Legitimate, Non-discriminatory Reason for Termination

IC presented a legitimate, non-discriminatory reason for terminating Newton. Although Newton does not believe he should have been terminated, he does not dispute that he committed the infractions or that the Discipline Policy called for his termination. Because IC has presented a legitimate, non-discriminatory reason for Newton's termination, the burden shifts to Newton to demonstrate that IC's proffered reasons are a mere pretext for race discrimination or that race played some factor in his termination.

Newton does not specify whether he is proceeding under the mixed motives theory or a pretext theory. Indeed, he fails altogether to address the burden-shifting framework beyond his conclusion that he has presented a *prima facie* case of race discrimination; thus, IC's motion should be denied.[118] The Court will nevertheless consider the record to determine whether any evidence exists to support either theory.

### 3. Mixed Motives/Pretext

Under either theory, "throughout the shifting back and forth of "intermediate evidentiary burdens" under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'"[119] When a Title VII case reaches the pretext stage of the analysis, the only question remaining is whether there is a conflict in substantial evidence to create a question for the factfinder.[120]

---

[118] *See* Rec. Doc. 42, p. 11.
[119] *Barnett v. Louisiana Department of Health*, No. , 2467877 (quoting *Reeves*, 530 U.S. at 143 (quoting *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981))).
[120] *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 404 (5th Cir. 1999) (citing *Rhodes v. Guiberson Oil Tools*, 75 F.3d 989, 993 (5th Cir. 1996) (noting that once a Title VII case reaches the pretext stage, the sufficiency of the evidence test is applied)).

To establish pretext, "[Newton] must substantiate his claim through evidence demonstrating that discrimination lay at the heart of [IC's] decision."[121] Newton "must rebut each non[-]discriminatory reason articulated by [IC]."[122] Further, Newton must rebut each reason by "produc[ing] substantial evidence of pretext."[123] "Evidence is substantial if it is of such quality and weight that reasonable and fair-minded men [or women] in the exercise of impartial judgment might reach different conclusions."[124] Newton may establish pretext by: (1) showing disparate treatment or (2) showing that IC's proffered explanation is false or unworthy of credence.[125] Critically, "[w]hen conducting a pretext analysis, the court is not to engage in second-guessing an employer's business decisions.[126] Anti-discrimination laws do not require an employer to make proper decisions, only [non-discriminatory] ones."[127]

While Newton did not point to any pretext evidence, the Court will assume he offers the purported disparate treatment of Moman as evidence of pretext. This argument fails for the reasons set forth above. Newton has offered no evidence to show that IC's reason for his termination was in any way motivated by race, or that IC's explanation for his termination was "false or unworthy of credence." Indeed, he admits the infractions and acknowledges the Discipline Policy.

Because Newton has failed to present a *prima facie* case of race discrimination, and he has alternatively failed to submit substantial evidence of pretext or racial animus

---

[121] *Price v. Fed. Express Corp.*, 283 F.3d 715, 720 (5th Cir. 2002).
[122] *Laxton v. Gap, Inc.*, 333 F.3d 572, 578 (5th Cir. 2003).
[123] *Wallace v. Seton Family of Hospitals*, 777 Fed. Appx. 83, 89 (5th Cir. 2019).
[124] *Id.*
[125] *See Id.*; *See also Vaughn v. Woodforest Bank*, 665 F.3d 632, 637-40 (5th Cir. 2011).
[126] *Culbert v. Cleco Corp.*, 926 F.Supp.2d 886, 894 (citing *LeMaire v. La. Dept. Of Transp. & Dev.*, 480 F.3d 383, 391 (5th Cir. 2007)).
[127] *Id.* (citing *LeMaire*, 480 F.3d at 391 (citing *Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991))).

for IC's legitimate, nondiscriminatory reason for his termination, IC's Motion for Summary Judgment shall be granted.

## III. CONCLUSION

For the foregoing reasons, IC's *Motion for Summary Judgment*[128] is GRANTED. Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

Baton Rouge, Louisiana, this  12th day of   December  , 2023.

_____
**SHELLY D. DICK
CHIEF DISTRICT JUDGE
MIDDLE DISTRICT OF LOUISIANA**

---

[128] Rec. Doc. 39.